IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 19-CR-1631 DHU |
| | ) |
| PRAGNESHKUMAR PATEL, | ) |
| | ) |
| Defendant. | ) |

**<u>DEFENDANT PRAGNESHKUMAR PATEL'S MOTION TO SEVER IN THE EVENT THE COURT DENIES THE GOVERNMENT'S MOTION TO SEVER COUNTS 11 AND 12 PERTAINIING TO DEFENDANT CRAFT AS ALLEGED IN THE SECOND SUPERSEDING INDICTMENT [DOC. 530]</u>**

The Defendant, Pragneshkumar Patel, by his attorneys, Jason Bowles of the Bowles Law firm, and Robert J. Gorence of the Gorence Law Firm, LLC, hereby submits his Motion to Sever in the Event the Court Denies the Government's Motion to Sever Counts 11 and 12 Pertaining to Defendant Craft as Alleged in the Second Superseding Indictment [Doc. 530]. In support, Mr. Patel states as follows:

**I.      PROCEDURAL HISTORY**

1.      On June 12, 2019, an Indictment was entered against Kamal Bhula, Jonathan Craft, Willie Horton and OMRAM, LLC. [Doc. 2]

2.      On November 5, 2019, a Superseding Indictment was filed adding Defendant Pragneshkumar Patel and charging him with Conspiracy; Sex Trafficking by Means of Force, Threats, Fraud, Aiding and Abetting; Benefitting Financially from a Sex Trafficking Venture, Aiding and Abetting; Interstate and Foreign Travel and Transportation in Aid of Racketeering Enterprises, Aiding and Abetting; Conspiracy; Maintaining a Drug-Involved Premises, Aiding and Abetting; and Maintaining a Drug-Involved Premises within 1,000 Feet of a School, Aiding and Abetting. [Doc. 68]

3. On May 9, 2023, a Second Superseding Indictment was entered. [Doc. 530]. The Second Superseding Indictment was after the January and April 2023 trial dates and well after the date for expert witness disclosures. The Second Superseding Indictment added Possession with Intent to Distribute Heroin and Possessing a Firearm in Furtherance of a Drug Trafficking Crime against Mr. Craft alone. The new allegations in Counts 11 and 12 do not allege any drug trafficking nor firearm offenses against Mr. Patel.

4. On May 25, 2023, the government filed its Motion to Sever Counts 11 and 12 alleged against Mr. Craft in order to maintain the current trial setting of July 17, 2023. [Doc. 549].

5. Also on May 25, 2023, Mr. Craft filed his response in opposition to the government's Motion to Sever [Doc. 550]. In essence, in his response, Mr. Craft opposes the severance of Counts 11 and 12 and demands his right to a speedy trial, particularly after having been held in custody for over three years.

## II. FACTUAL BACKGROUND WITH REGARD TO THE GOVERNMENT'S THEORY OF THE CASE

The government's evidence with regard to the second element to establish a violation of federal sex trafficking as alleged in Counts 2-4 of the Superseding Indictment was established during the *James* hearing and requires force, threats of force, fraud, and coercion would be used to cause that person to engage in a commercial sex act. The elements are as follows:

*First:*  The Defendant knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, advertised, patronized, or solicited a person, or knowingly aided, abetted, counseled, commanded, induced, or procured the recruitment, enticement, harboring, transportation, provision, obtaining, maintaining, advertising, patronizing, or solicitation of a person;

*Second:*  Knowing, or in reckless disregard for the fact, that means of force, threats of force, fraud, and coercion would be used

–2–

       to cause that person to engage in a commercial sex act;

  *Third:*   in or affecting interstate and foreign commerce.

On June 28, 2021, a hearing was held before the Honorable Kea W. Riggs, with regard to the government's motion to introduce co-conspirator statements. At the hearing, the Court gave the government the opportunity to prove by a preponderance the existence of a conspiracy to engage in federal sex trafficking and to seek a pretrial ruling on the admissibility of co-conspirator statements. During that hearing, the Homeland Security Case Agent, Morgan Langer, testified as follows with regard to the evidence to establish that any of the Defendants used force, threats of force, fraud, and coercion to cause any of the Jane Does to engage in commercial sex acts.

1. Q. [G]iven your expertise with sex-trafficking, the typical pimp sets the price of the sex act, correct? You know that to be true, given you're the expert?

  A. I don't know that that's the case every single time. It can be the case.

  Q. Okay. And in this case, you know that the Jane Does set up their price structure with every individual customer – I guess you'd call them johns? They did that by themselves, right?

  A. Sort of, because it was driven by the fees that they had to pay. So, no, I don't think they independently were able to set their prices without outside influence.

  Q. Okay. I understand that. But what I'm saying is that it wasn't dictated, like the normal pimp says, "You're going to do this to this guy, this act for this long, in exchange for this much money"? That didn't happen here by Mr. Patel, right?

  A. No, it wasn't that direct.

  Q. And none of the other defendants, either, right?

  A. Correct.

*See* Exhibit A, Transcript of Proceeding, James Hearing, at 119:2-23.

2. Q. The issue of drug use – because you've indicated that on direct –

        can be used by a pimp to keep a woman captive. That's what you're saying? That's a possibility of how you can coerce someone into sex-trafficking, is that if they don't perform an act, they don't get their fix. That's what you're saying, right?

A.     That's correct.

Q.     Now, in this case, Mr. Patel never supplied drugs to any of the Jane Does, right?

A.     Correct.

Q.     And he didn't supply drugs to any of the other women you've talked about, either by initials or by the anonymous 20, right?

A.     Correct.

Q.     And Mr. Bhula never did that, either?

A.     Correct.

Q.     But no one makes an allegation that Mr. Patel or any of the defendants kept money that was theirs or took money that was theirs, right? That doesn't exist in this case?

A.     I don't know that we never specifically asked them but, no, you're right, that's not something that I've ever heard.

*See* Exhibit A at 119:24-120:15, 122:7-13.

3.     Q.     Okay. Now, this issue of force that we talked about, we saw pictures of guns. None of the Jane Does say a gun was ever used against them, forcing them into prostitution, right?

A.     Correct.

Q.     Nobody ever said a knife – we've seen a couple knives there. Nobody said that a knife was ever used to force them into prostitution?

A.     Correct.

Q.     We saw the hammer and all these other implements. Nobody ever said those were used, keeping them doing what they were doing?

A.     Correct.

*See* Exhibit A at 123:12-24.

4.     Q.     The idea of physical force, none of the Jane Does, as you've said, we've got money off – none of the Jane Does said that Mr. Patel ever used physical force against them, right?

       A.     Correct.

       Q.     And none of the other 20, whether it's A.L. or the other people you identified, said that Mr. Patel ever used physical force to keep someone engaged in sex work, right?

       A.     Not Mr. Patel, no.

       Q.     Okay. And not Mr. Bhula, either?

       A.     Correct.

*See* Exhibit A at 123:25-124:11.

5.     Q.     What I'm getting at, though, this is the component that you're relying on to say that there was coercion. Do I have that right? The idea of a room fee and then an accumulated tally for what they owe?

       A.     Yes.

       Q.     And you're saying that forces them to engage in commercial sex acts?

       A.     Coerces them.

       Q.     So you don't know whether or not it's normal and customary, but let's touch on the idea, if someone doesn't pay for their room, is it standard then that property is kept?

       A.     The property is typically thrown away or disposed of, in my experience. It's not kept in a room and sold to other sex workers and other people.

       Q.     Let's get into – I want to get into the idea of how coerced they were, then. So given your expertise – and some of this is going to come out. So you've got quarter hours and half hours and hours, that you've already identified in certain texts, in exchange for various sex acts. And then we can see on the exhibits in Document 201, some of these women owed, it looks like, between $50 and up to $250. So the idea is that you're saying – and I want to get into

    this – between Jane Does 1, 2, and 3, their property at times was put into what you called storage?

A. Yes. I mean, at least one, Jane Doe 1, had lost her property.

Q. What about the other two?

A. The other two, I don't recall whether they had or not. I don't think – I don't think Jane Doe 3 had in that month that she lived there. But, again, her room was under Johnathan Craft's name, so I don't know that she would have even been subject to those, to that like loc-out situation. Jane Doe 2, I don't recall if she had her belongings taken or not.

Q. If Jane Doe 3 was only there for one month, it's highly unlikely she was there from September of '17 to March of '18 when Pete Patel was managing, right?

A. She was there for that month that we – when we interviewed her, she wanted to talk about that month. But I don't know. I can't say with certainty how many times or whether she stayed there.

Q. Let's take Jane Doe 1. So if her property was impounded and that caused her then, as you said, to engage in sex-trafficking by walking – you called it the track?

A. Yes, it's called the track.

*See* Exhibit A at 134:12-136-9.

6. Q. Next, so if that's the parameters of the level of indebtedness that caused the second element, caused them to engage in a commercial sex act, I want to get into the idea of their property being impounded. I see these pictures. Like with Jane Doe 1, what was the value of what she had impounded?

A. I don't have an inventory of what was impounded.

Q. What did she tell you?

A. I mean, it's what you'd expect, clothes, shoes, purses. But, you know, I mean, counsel, if you're essentially homeless and you live in a hotel and all of your clothes are taken and everything you own is taken, it doesn't really matter what the value would be. Wouldn't that be cataclysmic to your life?

Q. I'm just wondering, if they take their money with them, so all they

–6–

    have to do is – and they're prostitutes, and you said they walk the track – all they have to do is make enough to pay their room fees, and then they could be gone forever from Best Choice, right? They don't have to go back? They're not forced to go back? They just pay off their debt and leave, right?

A.   Not if there's nowhere to go.

Q.   They choose to stay at Best Choice after they've paid off their debts, right? That was their choice? They're not forced to go there?

A.   They somewhat are because their options of where they can stay are very, very limited.

*See* Exhibit A at 137:12-138:14.

This testimony shows that the government is not alleging that any Jane Doe was forced or coerced into sex trafficking by virtue of drugs, addictions, firearms or violence.

### III.  LEGAL STANDARD

Under Federal Rule of Criminal Procedure 8(a), "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." "[I]t is fundamental that charges may be joined in one indictment where they arise from the same or continuing act or transaction and are of the same or similar character, thus coming together to constitute parts of a common scheme." *United States v. Shelton*, 736 F.2d 1397, 1409 (10th Cir. 1984). *See also United States v. Riebold*, 557 F.2d 697, 707 (10th Cir. 1977)(holding that joinder is proper "[w]here the evidence overlaps and the offenses are similar. . . and the operable events occurred within a relatively short span of time"); *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999)(finding joinder of two robbery offenses improper where defendant "used distinctly different methods").

Despite the need for efficiency in judicial administration, a joint trial is inappropriate if it sacrifices a defendant's right to a fundamentally fair trial. *Baker v. United States*, 329 F.2d 786

(10th Cir. 1964), *cert. dismissed*, 379 U.S. 853 (1964). "[W]hen joinder of either defendants or offenses causes the actual or threatened deprivation of a fair trial, severance is no longer discretionary." *United States v. Butler*, 494 F.2d 1246, 1256 (10th Cir. 1974).

Therefore, even if separate counts or defendants are appropriately joined under rule 8, where that joinder "appears to prejudice a defendant or the government," a "court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a); *see also United States v. Hollis*, 971 F.2d 1441, 1456 (10th Cir. 1992). "Rule 14 provides a safety valve for the highly technical and inclusive analysis under Rule 8." *United States v. Thomas*, 61 F. Supp. 3d 1221, 1226 (D.N.M. 2014)(Vázquez, J.), *aff'd in part*, 849 F.3d 906 (10th Cir. 2017). *See also United States v Cox*, 934 F.2d 1114, 1119 (10th Cir. 1991) (applying rule 14 to set the standard for severance).

The rule operates to provide relief to otherwise properly joined offenses or defendants when proceeding to trial together would result in prejudice. *See id.* The prejudice standard envisioned by Rule 14 requires that defendants make a showing of actual prejudice, not merely a showing that they "may have a better chance of acquittal in separate trials." *United States v. Pursley*, 474 F.3d 757, 766 (10th Cir. 2007). To establish actual prejudice, "a defendant must point to a specific trial right that was compromised or show the jury was prevented from making a reliable judgment about guilt or innocence." *Id.* The defendant has the burden of making "a strong showing of prejudice." *United States v. Strand*, 617 F.2d 571, 575 (10th Cir. 1980). To establish real prejudice, the defendant must show that the prejudice he will suffer outweighs the expense and inconvenience of separate trials. *See United States v. Martin*, 18 F.3d 1515, 1518 (10th Cir. 1994). *See also United States v. Lewis*, 787 F.2d 1318 (9th Cir. 1986)(noting that there is "a high risk of undue prejudice whenever. . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be

inadmissible."); *United States v. Busic*, 587 F.2d 577, 585 (3d Cir. 1978) (suggesting that severance should be granted where evidence of a prior conviction would be admissible on one or more counts but inadmissible on others), *rev'd on other grounds*, 446 U.S. 398 (1980).

"The Tenth Circuit has recognized the persuasiveness of the cross-admissibility test stated by the United States Court of Appeals for the Third Circuit in *United States v. Busic* as an important factor in determining whether severance is advisable to assure a fair trial, but has not adopted it is as a per se rule." *See United States v. Martinez*, 542 F.Supp.3d 1170, 1215-16 (D.N.M. 2021) (internal quotations omitted). At least one other court in this district has noted its "agree[ment] with the general proposition that if evidence is not cross-admissible, that the inadmissibility is a factor in favor of severance, because rule 14(a) of the Federal Rules of Criminal Procedure disfavors joinder, where joinder 'appears to prejudice a defendant.'" *Id.* (citing Fed. R. Crim. P. 14(a); *United States v. Valentine*, 706 F.2d 282, 290 (10th Cir. 1983)).

In addition to the prejudice to the defendant resulting from joinder, severance may be ordered based at least in part on "logistical concerns" in the management of complex cases. *United States v. Kennedy*, 819 F.Supp. 1510 1515 (D.Colo. 1993)(collecting cases). Severance is a matter left to the trial court's "very broad" discretion. *United States v. Wiseman*, 172 F.3d 1196, 1211 (10th Cir. 1999). The Court has a "continuing duty at all stages of the trial to grant a severance if prejudice does appear." *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989) (quotations and citation omitted).

While "[t]here is a preference in the federal system for joint trials of defendants who are indicted together" in order to "promote economy and efficiency and avoid a multiplicity of trials[,]" these objectives must be achieved without "substantial prejudice to the rights of the defendants to a fair trial." *Zafiro v. United States*, 506 U.S. 534, 53740 (1993) (quoting *Bruton v. United States*, 391 U.S. 123, 131 (1968)). Remedial measures other than severance, such as

limiting instructions, may minimize or cure the risk of prejudice. *See id.* at 539. Given the complexity of a given case, the nature of the charges, and the volume of evidence, however, a trial court's limiting instructions may prove insufficient to remedy the substantial prejudice that may infect a joint trial. *See Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (J. Jackson concurring)(criticizing the use of limiting instructions in conspiracy trials); *see also Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962) (explaining "if you throw a skunk into the jury box, you can't instruct the jury not to smell it").

Beyond showing that a denial of severance would result in actual prejudice, a defendant must show "that this prejudice would 'outweigh' the expense and inconvenience of separate trials." *United States v. Hutchinson*, 573 F.3d 1011, 1025 (10th Cir. 2009)(citation omitted). Where offenses arise out of separate and unrelated transactions, courts save little time or resources in having a single trial. *See United States v. Mullen*, 550 F.2d 373, 375 (1977) ("Very little time is saved since the charges usually involve different transactions.. . . Ordinarily the only time saved by such joinder [based on the 'similar character' prong] is the selection of one jury rather than two."); *United States v. Halper*, 590 F.2d 422, 430 (2d Cir. 1978)(noting that advantages of joinder "largely disappear" where there is no common factual basis for two offenses).

### IV. ANALYSIS AND CONCLUSION

Here, Mr. Patel would be greatly prejudiced to have to suffer a trial with a co-defendant who is charged with unrelated offenses of drug trafficking and firearm possession in furtherance of a drug crime. The evidence that the government would offer against Mr. Craft would be greatly prejudicial to Mr. Patel when none of it would be relevant to his conduct nor the crimes with which he is charged. Under the Tench Circuit's "cross-admissibility" test, it is demonstrably clear that evidence of Mr. Craft's drug trafficking and gun possession would not be admissible in

the trial against Mr. Patel with regard to the crimes with which he is charged.

Notwithstanding what courts have called "logistical concerns" having to do with promoting economy and efficiency, in this case, the government three and a half years later has now charged completely separate and different crimes than what was originally charged against Mr. Patel in the first Superseding Indictment. The drug trafficking crimes are completely separate and unrelated transactions to the allegations of sex trafficking and money laundering.

What really is happening, is that the government is seeking to expand its theory of sex trafficking beyond the testimony of Agent Langer. Agent Langer could not have been more clear nor emphatic that drugs and firearms and violence were not facts sufficient to establish the second element of federal sex trafficking that the commercial sex worker had to be forced into the activity by force, threats of force, fraud, or coercion. The government has clearly recognized the pathetically thin theory of its case and now seeks to remedy that with a second Superseding Indictment of drug trafficking and firearm possession to bootstrap some idea that every single Jane Doe was forced to engage in sex acts because of drugs or guns. That is the entire purpose of the Second Superseding Indictment and it is patently outrageous as applied to Mr. Patel.

Accordingly, if the Court were to deny the government's motion to sever counts 11 and 12, then this motion to sever is ripe and Mr. Patel requests that he be tried alone.

                                        Respectfully submitted,

                                        */s/ Robert J. Gorence*
                                        Robert J. Gorence
                                        Gorence Law Firm, LLC
                                        300 Central Avenue SW, Suite 1000E
                                        Albuquerque, NM 87102
                                        Phone: 505-244-0214
                                        Email: gorence@golaw.us

                                        ---and---

Jason Bowles
Bowles Law Firm
4811 Hardware Drive, Bldg. D, Suite 5
Albuquerque NM 87109
Phone:   (505) 217-2680
Email: jason@bowles-lawfirm.com

*Attorneys for Defendant Pragneshkumar Patel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of June, 2023, I filed the foregoing electronically through the Court's CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alexander Uballez, Attorney for the United States
alexander.uballez@usdoj.gov

Letitia Simms, Attorney for the United States
letitia.simms@usdoj.gov

Jack Burkhead, Attorney for the United States
jack.e.burkhead@usdoj.gov


*/s/ Robert J. Gorence*
Robert J. Gorence
Gorence Law Firm, LLC