```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3    UNITED STATES OF AMERICA,

 4              Plaintiff,

 5         vs.                                    CR-19-1631 KWR

 6    KAMAL BHULA, a.k.a. "Rocky,"
      JOHNATHAN CRAFT, a.k.a. "Jonathan
 7    Craft," a.k.a. "YN," a.k.a "Wayan,"
      EDDIE HILL,
 8    WILLIE HORTON,
      PRAGNESHKUMAR PATEL, a.k.a. "Pete,"
 9    and "OMRAN, LLC,

10              Defendants.

11

12              TRANSCRIPT OF PROCEEDINGS
                     JAMES HEARING
13         BEFORE THE HONORABLE KEA W. RIGGS
              UNITED STATES DISTRICT JUDGE
14         MONDAY, JUNE 28, 2021, 9:10 A.M.
               ALBUQUERQUE, NEW MEXICO

15

16    FOR THE PLAINTIFF UNITED STATES OF AMERICA:

17         UNITED STATES ATTORNEY'S OFFICE
           District of New Mexico
18         201 Third Street, Northwest
           Suite 900
19         Albuquerque, New Mexico  87102
           BY:  MS. LETITIA CARROLL SIMMS
20              --AND--
                MR. ALEXANDER MAMORU MAX UBALLEZ
21

22    FOR THE DEFENDANT KAMAL BHULA:

23         THE LAW OFFICE OF NICOLE W. MOSS
           Attorneys at Law
24         201 Twelfth Street, Northwest
           Albuquerque, New Mexico  87102
25         BY:  MS. NICOLE W. MOSS
```

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

EXHIBIT A

```
 1      FOR THE DEFENDANT JOHNATHAN CRAFT:

 2           THE LAW OFFICE OF MEREDITH M. BAKER, LLC
             Attorneys at Law
 3           Post Office Box 7415
             Albuquerque, New Mexico  87194
 4           BY:  MS. MEREDITH M. BAKER

 5


 6      FOR THE DEFENDANT EDDIE HILL:

 7           THE LAW OFFICE OF WAYNE BAKER
             Attorneys at Law
 8           14112 Piedras Road, Northeast
             Albuquerque, New Mexico  87123-2323
 9           BY:  MR. WAYNE BAKER

10


11      FOR THE DEFENDANT PRAGNESHKUMAR PATEL:

12           BOWLES LAW FIRM
             Attorneys at Law
13           4811 Hardware Drive, Northeast
             Building D, Suite 5
14           Albuquerque, New Mexico  87109
             BY:  MR. JASON BOWLES
15
             --AND--
16
             GORENCE & OLIVEROS, PC
17           Attorneys at Law
             300 Central Avenue, Southwest
18           Suite 1000E
             Albuquerque, New Mexico  87102
19           BY:  MR. ROBERT J. GORENCE

20

21

22

23

24

25
```

```
 1        Q.  We're going to get into the room fees, the guest
 2   charge.  Next, let me ask you, given your expertise with
 3   sex-trafficking, the typical pimp sets the price of the
 4   sex act, correct?  You know that to be true, given
 5   you're the expert?
 6        A.  I don't know that that's the case every single
 7   time.  It can be the case.
 8        Q.  Okay.  And in this case, you know that the Jane
 9   Does set up their price structure with every individual
10   customer -- I guess you'd call them johns?  They did
11   that by themselves, right?
12        A.  Sort of, because it was driven by the fees that
13   they had to pay.  So, no, I don't think they
14   independently were able to set their prices without
15   outside influence.
16        Q.  Okay.  I understand that.  But what I'm saying is
17   that it wasn't dictated, like the normal pimp says,
18   "You're going to do this to this guy, this act for this
19   long, in exchange for this much money"?  That didn't
20   happen here by Mr. Patel, right?
21        A.  No, it wasn't that direct.
22        Q.  And none of the other defendants, either, right?
23        A.  Correct.
24        Q.  The issue of drug use -- because you've indicated
25   that on direct -- can be used by a pimp to keep a woman
```

```
 1        captive.  That's what you're saying?  That's a
 2        possibility of how you can coerce someone into
 3        sex-trafficking, is that if they don't perform an act,
 4        they don't get their fix.  That's what you're saying,
 5        right?
 6             A.   That's correct.
 7             Q.   Now, in this case, Mr. Patel never supplied drugs
 8        to any of the Jane Does, right?
 9             A.   Correct.
10             Q.   And he didn't supply drugs to any of the other
11        women you've talked about, either by initials or by the
12        anonymous 20, right?
13             A.   Correct.
14             Q.   And Mr. Bhula never did that, either?
15             A.   Correct.
16             Q.   And, in fact, the other defendants -- and we can
17        talk about that, and their lawyers will do this -- they
18        might have enjoyed drugs with some of the women, but
19        they never directly supplied drugs to them, right?
20             A.   I don't have that information in front of me.
21             Q.   Meaning that it doesn't exist?
22             A.   I wouldn't characterize it that way, no.
23             Q.   I'll let those lawyers clarify, but at least with
24        regard to Patel and Bhula, they never supplied drugs.
25        So this isn't an issue that you're talking about, with
```

1    that was left behind.  None of the women said they left
2    money behind in their room, did they, Jane Doe 1, 2, or
3    3?
4         A.   Money --
5         Q.   The idea that what was seized was just a bunch of
6    clothes, maybe some shoes, we've seen the pictures, and
7    we'll get into the value of that.  ==But no one makes an==
8    ==allegation that Mr. Patel or any of the defendants kept==
9    ==money that was theirs or took money that was theirs,==
10   ==right?  That doesn't exist in this case?==
11        ==A.   I don't know that we ever specifically asked them==
12   ==but, no, you're right, that's not something that I've==
13   ==ever heard.==
14        Q.   Well, if you haven't asked them and we're getting
15   ready for a trial, it's not in any of the discovery,
16   none of the women said that, Jane Doe 1, 2, or 3 or the
17   other ones, no one said that these defendants ripped off
18   their prostitution earnings to keep them in bondage,
19   right?
20        A.   They collected the fees.
21        Q.   The room fees.  We're going to touch on that.
22   I'm talking about what they received from this
23   prostitution activity, under State laws.  They never
24   kept their money nor took it illegally, right?
25        A.   The whole case is based on that they took it

1    illegally by these, you know, these fees, these --
2         Q.   Well, the jury is going to decide whether that
3    amounts to coercion.  I get it.  But what I'm asking you
4    is really straightforward.  Did they steal money from
5    the women to keep them in sexual bondage?  The answer to
6    that is "No," right?
7         A.   I disagree with you on that.
8         Q.   By virtue of the room fee, the $10 charge and
9    the --
10        A.   And the late fee and the charging different
11   amounts for the rooms for the different people.
12        Q.   Okay.  Now, this issue of force that we talked
13   about, we saw pictures of guns.  None of the Jane Does
14   say a gun was ever used against them, forcing them into
15   prostitution, right?
16        A.   Correct.
17        Q.   Nobody ever said a knife -- we've seen a couple
18   knives there.  Nobody said that a knife was ever used to
19   force them into prostitution?
20        A.   Correct.
21        Q.   We saw the hammer and all these other implements.
22   Nobody ever said those were used, keeping them doing
23   what they were doing?
24        A.   Correct.
25        Q.   The idea of physical force, none of the Jane

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1      Does, as you've said, we've got money off -- none of the
 2      Jane Does said that Mr. Patel ever used physical force
 3      against them, right?
 4          A.   Correct.
 5          Q.   And none of the other 20, whether it's A.L. or
 6      the other people you identified, said that Mr. Patel
 7      ever used physical force to keep someone engaged in sex
 8      work, right?
 9          A.   Not Mr. Patel, no.
10          Q.   Okay.   And not Mr. Bhula, either?
11          A.   Correct.
12          Q.   So the only one we have is the thrown candy bar?
13      Is that the one time we're talking about that somehow --
14      you called it an argument, not a fight.  Were there
15      physical blows thrown by virtue of the candy bar being
16      tossed?
17          A.   There were two instances.  There was the candy
18      bar, and then there was the reporting that we had on the
19      two women that Johnathan Craft got into the fight with,
20      for lack of a better word.
21          Q.   Okay.  We'll get to that.  This is a James
22      hearing.  But the Johnathan Craft incident, we don't
23      even know the woman involved, right?  We don't have her
24      name?
25          A.   We have first names.
```

```
 1     practice for hotels in Albuquerque?
 2         A.  I have not.
 3         Q.  Would it be important if it's done not only
 4     routinely, but by Marriott and Hyatt as well, that they
 5     charge additional fees for additional people within a
 6     room?
 7         A.  I think it would depend on if they did it
 8     similarly to how it's done here.  You know, I'd have to
 9     look at the policy, obviously.  I can't make a blanket
10     statement that what the Marriott does is going to be
11     exactly congruent to what the Best Choice Inn did.
12         Q.  What I'm getting at, though, this is the
13     component that you're relying on to say that there was
14     coercion.  Do I have that right?  The idea of a room fee
15     and then an accumulated tally for what they owe?
16         A.  Yes.
17         Q.  And you're saying that forces them to engage in
18     commercial sex acts?
19         A.  Coerces them.
20         Q.  So you don't know whether or not it's normal and
21     customary, but let's touch on the idea, if someone
22     doesn't pay for their room, is it standard then that
23     property is kept?
24         A.  The property is typically thrown away or disposed
25     of, in my experience.  It's not kept in a room and sold
```

1  to other sex workers and other people.
2      Q.  Let's get into -- I want to get into the idea of
3  how coerced they were, then.  So given your expertise --
4  and some of this is going to come out.  So you've got
5  quarter hours and half hours and hours, that you've
6  already identified in certain texts, in exchange for
7  various sex acts.  And then we can see on the exhibits
8  in Document 201, some of these women owed, it looks
9  like, between $50 and up to $250.  So the idea is that
10 you're saying -- and I want to get into this -- between
11 Jane Does 1, 2, and 3, their property at times was put
12 into what you called storage?
13     A.  Yes.  I mean, at least one, Jane Doe 1, had lost
14 her property.
15     Q.  What about the other two?
16     A.  The other two, I don't recall whether they had or
17 not.  I don't think -- I don't think Jane Doe 3 had in
18 that month that she lived there.  But, again, her room
19 was under Johnathan Craft's name, so I don't know that
20 she would have even been subject to those, to that like
21 lock-out situation.  Jane Doe 2, I don't recall if she
22 had her belongings taken or not.
23     Q.  If Jane Doe 3 was only there for one month, it's
24 highly unlikely she was there from September of '17 to
25 March of '18 when Pete Patel was managing, right?

1          A.   She was there for that month that we -- when we
2     interviewed her, she wanted to talk about that month.
3     But I don't know.  I can't say with certainty how many
4     times or whether she stayed there.
5          Q.   Let's take Jane Doe 1.  So if her property was
6     impounded and that caused her then, as you said, to
7     engage in sex-trafficking by walking -- you called it
8     the track?
9          A.   Yes, it's called the track.
10         Q.   There's other hotels that actually on Central
11    have prostitution activities, right?
12         A.   That prostitutes take their customers back to?
13         Q.   Yes.
14         A.   Yes.
15         Q.   Obviously, all of these -- any one of these Jane
16    Does or all of the other women could just go to a
17    different hotel, right?
18         A.   No, not -- not correct.  Many won't rent to known
19    sex workers, so if they've had experience with them
20    before or see them walking the track, they'll keep, you
21    know, kind of a record of people that they won't rent
22    to.
23         Q.   And what's your basis of knowing that?
24         A.   Talking to other hotel owners, talking to other
25    sex workers.

```
 1         Q.  So when Jane Doe 1 had her property impounded,
 2   what was the value of that?  Because this will come out
 3   at trial.  You call it this economic bondage because
 4   there's this ongoing debt of the room and then her
 5   property, so I want to know -- we can see from the
 6   exhibit about outstanding, the debt -- because it's all
 7   laid down there on the records, and it goes from $50 to
 8   $250 -- to say that that's what forces them into
 9   commercial sex work, that debt.  That's what you're
10   saying?
11         A.  Correct.
12         Q.  Next, so if that's the parameters of the level of
13   indebtedness that caused the second element, caused them
14   to engage in a commercial sex act, I want to get into
15   the idea of their property being impounded.  I see these
16   pictures.  Like with Jane Doe 1, what was the value of
17   what she had impounded?
18         A.  I don't have an inventory of what was impounded.
19         Q.  What did she tell you?
20         A.  I mean, it's what you'd expect, clothes, shoes,
21   purses.  But, you know, I mean, counsel, if you're
22   essentially homeless and you live in a hotel and all of
23   your clothes are taken and everything you own is taken,
24   it doesn't really matter what the value would be.
25   Wouldn't that be cataclysmic to your life?
```

    1        Q.  I'm just wondering, if they take their money

    2   with them, so all they have to do is -- and they're

    3   prostitutes, and you said they walk the track -- all

    4   they have to do is make enough to pay their room fees,

    5   and then they could be gone forever from Best Choice,

    6   right?  They don't have to go back?  They're not forced

    7   to go back?  They just pay off their debt and leave,

    8   right?

    9        A.  Not if there's nowhere to go.

   10        Q.  They choose to stay at Best Choice after they've

   11   paid off their debts, right?  That was their choice?

   12   They're not forced to go there?

   13        A.  They somewhat are because their options of where

   14   they can stay are very, very limited.

   15        Q.  Have you ever -- besides Jane Doe 1, is there any

   16   other person that you have interviewed, that will

   17   testify, that says that they were forced, by virtue of

   18   this payment structure, to engage in commercial sex

   19   acts?

   20        A.  Yes.

   21        Q.  Who?

   22        A.  All the women I've talked about have talked about

   23   how this fee structure kept them essentially in this

   24   life.  They didn't always word it in the most articulate

   25   way.  Sometimes they didn't realize how exploitative it