IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CRIMINAL NO. 19-1631 DHU |
| ) | |
| ) | |
| **PRAGNESHKUMAR PATEL,** ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S
OBJECTIONS TO THE PRESENTENCE REPORT (DOC. 610)**

The United States hereby responds to Defendant Patel's objections to the second presentence report (Doc. 610) filed November 1, 2023. On July 13, 2023, the Defendant pleaded guilty to Count 8 of the Second Superseding Indictment, charging Maintaining a Drug-Involved Premises and Aiding and Abetting, in violation of 21 U.S.C. § 856(a) and 18 U.S.C. § 2. In his plea agreement, Defendant Patel provided a robust and detailed factual basis to support his guilty plea. It starts with him declaring under penalty of perjury that, between approximately September 2017 and March 2018, he managed and controlled the Best Choice Inn. Doc. 580, p 4. He admitted under oath that in March 2018, he leased the Best Choice Inn to co-defendant Kamal Bhula, who took over the on-site management of the hotel until June 18, 2019. *Id*. Patel also swore under oath in his plea agreement that from September 2017 through June 18, 2019, he made a profit from renting the hotel to tenants who used controlled substances on the premises, and he made it available for the purpose of unlawfully using controlled substances. *Id*. Patel admitted under oath that in his capacity as an owner and manager, he knew the tenants he rented to and persons he employed were using controlled substances in the individual rooms of the hotel and on the overall premises. *Id*. Patel also swore that in his capacity as the owner and manager, he knew that "rampant drug use" was occurring at the Best Choice Inn by the tenants and

employees. *Id*. Furthermore, Patel swore under oath in his plea agreement that he was confronted with physical evidence of "pervasive drug use" at the Best Choice Inn, and he personally observed such activity on the premises. *Id*. Finally, Patel admitted under oath that he knew that using controlled substances was one of the primary purposes of the Best Choice Inn, and that he nevertheless allowed it to continue. *Id*.

Despite that detailed factual basis, Defendant Patel now appears to be disputing everything to which he swore to in the plea agreement, stating, "[T]here is no evidence that [he] knew or believed that the Best Choice Inn was a primary purpose drug "stash house" disguised as a legitimate commercial venture." Doc. 610, p 1. The United States reads his objections to the PSR as a repudiation of the factual basis he offered the Court under oath. Indeed, his factual objections are all based on general claims that the evidence or allegations are untrue, or that he was unaware of what was going on at his own hotel.

It is the Tenth Circuit's position that a defendant does "not properly dispute facts in the PSR where he ha[d] only objected to the credibility or reliability of a source or information." *United States v. McDonald*, 43 F.4th 1090, 1097 (10th Cir. 2022). The Tenth Circuit noted that "[t]his is a position shared by the Fourth Circuit." *Id*., citing *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990)(a defendant has an affirmative duty to make a showing that the information in the PSR is unreliable and articulate the reasons why the facts contained therein [a]re untrue or inaccurate.); *United States v. Smith*, 86 F.3d 1154 (4th Cir. 1996) (finding the PSR could be relied upon when neither defendant's objections "asserted that the information contained in their presentence reports is untrue. Although both argue that the information is unreliable, they have offered no support for this conclusion other than the fact that the information is hearsay"). This position is consistent with that taken by other circuits as well. See, e.g., *United States v. Gracia*, 983 F.2d 625, 629 (5th Cir. 1993) ("Presentence reports generally

bear indicia of reliability sufficient to permit reliance thereon at sentencing"); *United States v. Robins*, 978 F.2d 881, 889 (5th Cir.1992) (district court may properly rely on "presentence report's construction of evidence to resolve a factual dispute, rather than relying on the defendant's version of the facts"); *United States v. Curran*, 967 F.2d 5, 6 (1st Cir. 1992) (court correctly relied on $10,000 interest calculation mentioned in the presentence report); *United States v. Skrodzki*, 9 F.3d 198, 202 (1st Cir. 1993); see also *United States v. Gutierrez-Lara*, 2022 WL 2188536, *2 (5th Cir. June 17, 2022) (unpublished) (sentencing court is within its discretion to credit the information in the PSR over the objections by defendant); *United States v. Amado-Reyes*, 591 F. App'x 290, 291 (5th Cir. Jan. 28, 2015) (unpublished) (district court was free to adopt as fact a witness statement contained in the PSR that, on one unspecified occasion, defendant made verbal threats while a gun was visible on his waist; defendant's denial of such conduct did not constitute competent rebuttal evidence).

While Defendant Patel begrudgingly admits that there was drug use going on at his hotel, he denies knowing that there was drug trafficking going on at the hotel. This denial is irrelevant, although hard to believe considering Defendant Patel lived and worked at the Best Choice Inn for approximately six months.

Keeping in mind the caselaw above, the United States will address the defendant's objections below:

   I.      **Defendant's Objections to the Organizer Leader Enhancement**

Defendant Patel objects to his role as organizer/leader, again denying knowledge of the drug activity conducted by co-defendants Craft and Horton. Like Kamal Bhula, Patel operated on a lofty perch in the Best Choice hierarchy, thus he was too high in the criminal enterprise chain to get his hands dirty with activities like selling or using drugs. Indeed, the United States does not believe Defendant Patel used or sold drugs. But, that does not exculpate him. He was a

slumlord who knew full well that the hotel he purchased was in a crime-ridden area – replete with drugs and prostitution – so he took a if-you-can't-beat-them-join-them approach. Rather than clean up the mess, he decided instead to exploit the crime for his own profit. From his perspective, this was a low-risk proposition—after all, who was going to report him to the authorities? So, he set about establishing the exploitive business practices of the hotel, and then recruited others to partake in the criminal activity.

When co-defendant Bhula was interviewed by agents on June 18, 2019, he made the following statements regarding Defendant Patel:

```
 8    SA LANGER: All right. This whole way that
 9    you -- that you run the hotel with this -- you know, the
10    fees for the guests, the fees for the visitors, the --
11    the locking of people out. Like, who -- who told you to
12    do that or is it just something you came up on your own?
13    MR. BHULA: No. When I -- when I came, my
14    brother-in-law used to do that, and then I just
15    followed.
16    SA LANGER: Okay. Did he -- he taught you how
17    to do it?
18    MR. BHULA: Yeah. He showed me how
19    [INAUDIBLE].
20    SA LANGER: Okay. Does -- how did that go? I
21    mean, like, explain to me did he -- did he tell you,
22    like -- 'cause he's -- he owns it, right?
23    MR. BHULA: Right.
24    SA LANGER: So is he your boss?
25    MR. BHULA: Well, he gave it to me on a lease.
```

Russin Reporting, LLC

Transcript Kamal Bhula, p.29.

```
No. 2019-cr-01631-DHU                              Interview of Kamal Bhula
US v. Bhula, et al.                                        January 06, 2023
```

1  So, yeah, he is a boss. With any decision, big
2  decision, I have to confirm with him. I cannot make any
3  decision on my own.
4        SA LANGER: Can you hire on your own?
5        MR. BHULA: Yeah.
6        SA LANGER: Can you fire on your own?
7        MR. BHULA: Yeah.
8        SA LANGER: Okay. What about if you wanted
9  to do, like, a big renovation to the hotel -- like, a
10 [INAUDIBLE]? You couldn't do that on your own?
11       MR. BHULA: No.
12       SA LANGER: All right. So, like, you come on.
13 He asked you to come on, or did you ask to come on to
14 the hotel?
15       MR. BHULA: No. He asked me, because he was
16 getting another motel.

*Id.*, p 30.

4        SA LANGER: Okay. And -- and he taught you
5  these various practices?
6        MR. BHULA: Yeah. And he used to tell me at
7  12:00 o'clock, you need to charge single or more, 2:00
8  o'clock, because, otherwise, they don't get out of their
9  room.
10       SA LANGER: Okay.
11       MR. BHULA: And if you don't charge for
12 visitors, then they put nine, ten people in a room.

*Id.*, p 31.

Not only did Bhula learn the tricks of the criminal trade from Patel, he had to check with Patel before making any big decisions.

Willie Horton also perceived Patel to be in charge, and at least willingly carried on the visitor fees, and then trained Kamal Bhula to do the same when Patel recruited him. When agents interviewed Willie Horton upon his arrest on June 18, 2019, he made the following statements:

> 22   SA LANGER: You don't know Pete Patel?
> 23   MR. HORTON: Yeah, Pete -- Peter used to come
> 24   through there. Peter was there first. Peter's the one
> 25   that actually hired me.

Willie Horton transcript, at p. 14.

> 16   MR. HORTON: What I'm telling you -- I -- when
> 17   I applied for a job there, Peter Patel actually was the
> 18   one that came down, scouted the location, and --
> 19   SA LANGER: Okay.
> 20   SA DIAMOND: So what was Peter's position when
> 21   he was there?
> 22   MR. HORTON: Manager.

*Id.* at p 15.

```
13          So I guess Mr. Wu decided to charge them.  And
14   that carried over to Peter, and he started doing it.
15   You know what I mean?  And --
16          SA LANGER:  So you think Wu told Peter, like,
17   "You got to do this?"
18          MR. HORTON:  I know he did.
19          SA LANGER:  You know he did?
20          MR. HORTON:  I know he did.
21          SA LANGER:  And then Peter told Kamal --
22          MR. HORTON:  Yeah, because --
23          SA LANGER:  -- or Rocky?
24          MR. HORTON:  -- because of where it's located,
25   it's homelessness.  It's drug addiction.  It's
```

Russin Reporting, LLC
575-202-4797

---

No. 2019-cr-01631-DHU                                    Page 29
US v. Bhula, et al.                         Interview of Willie Horton
                                                   January 06, 2023

```
1   prostitution.  It's this, that, and the other.  All --
```

Id, pp. 28-29.

What all of this means is that Defendant Patel is the one who started this entire scheme. He purchased the hotel and found a way to make money off people who had no money through the visitor fees. On the defendant's own admission, "visitor fees" were applicable to everyone, including the drug users/sellers. Patel's answer to all this is that visitor fees were necessary because his utility bills rose with the introduction of each knew visitor.   This, of course, is disingenuous. Lights and the heat are fixed costs—they do not wax and wane based on the number of people in a room. This is borne out on the data recovered by law enforcement which

revealed that the water bill payments at the Best Choice did not show an unreasonable amount for a hotel this size. Thus, the Court can be confident – just as the grand jury was – that the visitor fees were a way to financially profit from the crime that was occurring at the hotel.

Further, Defendant Patel not only worked, lived, and managed the hotel for the first six months of the indictment period, but he recruited people, including Willie Horton and Kamal Bhula, who would continue to run the hotel and enforce his rules. He trained Horton and Bhula to levy and collect fees, and he showed them how to effect the lockouts. Patel's argument that his way was how all hotels operate strains credulity. Any reputable hotel would refuse to rent to a person who repeatedly did not pay their bill. But, Pete Patel did because he knew this clientele would pay, and he knew he would get his money. And after he recruited Bhula, he charged him over $21,000 a month to lease it from him. The mortgage on the property was approximately $9,000. Patel was making approximately $12,000 profit a month from the Best Choice Inn, all derived from dope and prostitution. Patel knew this, and he knew that he was benefitting by being at the top of the food chain because, like many other leaders/organizers, he could count on the underlings taking the fall if things went sour.

*Request for mitigating role*

Defendant Patel not only maintained a drug-involved premises, but he experienced a financial windfall by doing so. Out of all of the defendants in this case, Mr. Patel by far made the most money off this scheme. Mr. Patel understood clearly the scope and degree of the criminal activity. As the owner of a premises that was one of the epicenters of crime in Albuquerque, all Patel needed to do was occasionally look out his apartment window during those first six months to see what was happening at his hotel. At trial the United States would have put for the evidence that Patel hired Willie Horton because he perceived Horton to be able to exert some sort of control over the tenants so they would pay the money. It was important for Patel to maintain

control over the tenants, otherwise he wouldn't be paid. The police were being called on a regular basis to the motel for drugs and drug-related subject matter. Just in the second three months of when Patel lived at the motel, there were approximately eleven incidents where drug use was documented.[1] (Exhibit 1). In fact, from January 1, 2018 through October 1, 2018, there were 150 calls to APD stemming from the Best Choice Inn. (Exhibit 2).  Patel had even been contacted by the city to take some type of action, given the illegal activity at the Best Choice Inn. (Trial Exhibit 97).

     Patel knew the scheme because he set the terms. He them trained his employees on those terms. And despite being confronted time and time again, he allowed rampant drug use to occur on his property because he was making money from it. There is no other reason for a legitimate business owner to allow such activity.

     Patel planned and organized the criminal activity as well. The "visitor fee" was how he planned to make money off the rampant drug use in his hotel. The United States expects the defendant to argue that the prior owner, Mr. Wu, was lodging the visitor fees, and therefore it was really Mr. Wu and not Mr. Patel that came up with the scheme. It may be that Mr. Wu levied fees, however, when Mr. Patel purchased the hotel it was his to run how he saw fit, and he saw fit to exploit his tenants. Testimony at trial would prove that Defendant Patel took the Best Choice Inn down a much farther hole than Mr. Wu had allowed. The argument of "well everyone else was doing it," should not pass muster in this Court. Nor should the broken goods defense of "things were already messed up, so it shouldn't matter if I keep messing them up." This is akin to

---

[1] Police were called on other occasions in addition to the eleven, but for the purpose of this pleading, the United States has only pulled the eleven drug related incidents it has in its possession dating from January 1, 2018 through March 30, 2018

when an abusive foster parent justifies his abuse by saying, "well the kid was already being abused when he got here, so its not that bad if I do it too because didn't start it."

Pete Patel saw an opportunity to make money in the southeast area of Albuquerque and he took it, uncaring whether he parasitically drained drug addicts and sex workers dry. He didn't care what people did in his hotel rooms as long as they paid him his money. He was slum lord, and he recruited his brother-in-law and any other person he perceived to be a street person who could enforce his rules. These people were the ones who took the risk for him. Willie Horton, Jonathan Craft, and Eddie Hill were the ones on the front line making his scheme work, while Pete sat back and counted his money. When the time came for it to end, Patel predictably laid the blame on those underneath him – the workers and Kamal Bhula – who he would claim inexplicably went rogue and ruined his otherwise untarnished business. This is the benefit to being at the top, claiming that all the people below you are the real criminals while you were just trying to make a living.

Under these facts, Defendant Patel was not a minor participant. He did not perform a limited function in this scheme. To the contrary, Patel allowed his hotel to be used as a drug premises because he was making good money that way and he wanted to keep making good money.

## II. Defendant's Objection to Offense Level based on Quantity of Drugs

Defendant Patel objects to the inclusion of all narcotics seized in this matter as used to calculate his base offense level. He claims he had no idea there were drugs in the drug premises, and argues that the rules of offense level calculation should not apply to him. However, these amounts are appropriately included in the calculation as relevant conduct. USSG §1B1.3(a)(1)(B) states:

> In the case of a jointly undertaken criminal activity (a criminal plan,

> scheme, endeavor, or enterprise undertaken by the defendant in concert with others, ***whether or not charged as a conspiracy***), all acts and omission of others that were –
> (1) Within the scope of the jointly undertaken criminal activity,
> (2) In furtherance of that criminal activity, and
> (3) Reasonably foreseeable in connection with that criminal activity;
> That occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection of responsibility for that offense.

(emphasis added).

Here, this is jointly undertaken criminal activity. Defendants Bhula, Patel, and Horton all pleaded guilty to maintaining the same drug-involved premises, and Defendant Craft pleaded guilty to Conspiracy to do the same. These admissions all were taken under oath in court, and the Court can consider that as undisputed evidence that the maintenance of the Best Choice Inn as a drug-involved premises was jointly undertaken criminal activity.

The offense level in this case is based on the entirety of the narcotics <u>seized</u> in this case, both on the day of the take-down, and in the controlled purchases leading up to the takedown. It does not take into account evidence of narcotics as can be gleaned from the text messages, or evidence of narcotics the Jane Does admitted to using during the time frame of the indictment period, although if it did, that would also be proper. In a case of jointly undertaken criminal activity, a defendant's relevant conduct includes all reasonably foreseeable acts of others in furtherance of the jointly undertaken criminal activity. *United States v. Topete-Plascencia*, 351 F.3d 454, 459 (10th Cir. 2003). A "District Court may consider the amount of drugs the defendant knew or should have known were involved in the conspiracy in calculating a defendant's relevant conduct." *Id*. Additionally, "the district court may rely on factually supported estimates when the actual drugs underlying the offense are not seized." *Id*, citing *United States v. Ruiz-Castro*, 92 F.3d 1519, 1534 (10th Cir. 1996)(overruled on other grounds).

In this case, the offense level calculation does not include estimates of narcotics in the

hotel that were not seized but that are factually supported (additional narcotics observed in Michael Avila's room; daily usage estimates by the Jane Does, evidence in Jane Doe 1 and 2's text messages of specific drug transactions with Craft and Horton; Jane Doe 3's statement regarding narcotics given to her at the hotel by Greg "Big Man" Weighman as observed by Jonathan Craft; the amount seized by BCSO from Dustin Swanson's room in 2018; the amount that could be gleaned by the mountain of syringes found in the trash pull; or the amounts possessed by those referenced in Exhibit 1, etc.). Therefore, the Court should not be concerned that the amount of narcotics seized, most of which came from one single day at the hotel, is somehow a vast exaggeration of how much drugs was going through this hotel. Again, this was just a snapshot from a two-year time period.

      Mr. Patel admits to maintaining a drug-involved premises. He admits drug use was "rampant," and that he himself knew about it. Of course, it was foreseeable that this amount of drugs (*at least*) would be seized in this case. Not only did he allow the drug use to continue, but he profited greatly from these activities.

      Defendant Patel admits in his plea agreement, under oath, of his involvement in this matter, then in his objections states he had no idea drug use was going on in his hotel. This statement runs counter to his own sworn plea agreement. It is not logical or probable that Defendant Patel, while maintaining a drug premises where he worked and lived would have no inkling at all that his co-defendant, who he hired as a security guard and who worked, lived, and also sold drugs at the Best Choice Inn, would have drugs on him and in his car when he left the Best Choice Inn. Only through a willful suspension of disbelief could this Court conclude that despite the overwhelming evidence of rampant drug activity at the Best Choice Inn, and despite that Defendant's admissions, he would have no idea that there would be drugs in the drug-premises. To be sure, no one is accusing Mr. Patel of laying eyes on every gram of dope that

went in and out of the Best Choice Inn. But it is not necessary that the United States prove such specific knowledge. He was at the top of the totem pole, he knew drugs were "rampant," and it was certainly foreseeable to him that his co-defendants would be trafficking controlled substances.   Under these circumstances, it was completely foreseeable to Defendant Patel that Willie Horton, a person Patel recruited, would have narcotics on his person and in his vehicle that he parked at the hotel.

The case law cited by defendant should not be persuasive because the facts are not similar to this case. First, Defendant Patel admitted to maintaining a drug-involved premises. So did Willie Horton and Kamal Bhula. Defendant Patel swore under oath that he conspired with Defendant Patel to maintain a drug-involved premises. However, defendant Patel cites *United States v. Evans* for the proposition that he should not be held responsible for the drugs found on Mr. Horton's person. 970 F.2d 663 (10th Cir. 1992). The issue before the court in the *Evans* case was whether there was sufficient evidence to convict the defendant of the conspiracy. Patel is not convicted of a conspiracy, but is convicted of the substantive count. Even so, the evidence of the defendant's involvement in the conspiracy in *Evans* is much less than what we have in this case. The *Evans* defendant purchased crack one time from another defendant, and another time lent the co-conspirators some scales. *Id*. at 673. She seemingly did not have large involvement in the overall drug trafficking scheme, and the Tenth Circuit ruled that the evidence of her involvement in the larger conspiracy was insufficient. Here, defendant Patel's conduct goes far beyond the conduct in *Evans*. Patel literally ran a slum wherein he exploited drug addicts for profit, and that was the business plan. He made thousands and thousands of dollars doing this. The Court should reject any comparison to the *Evans* case.

Furthermore, there is support in Tenth Circuit case law that this enhancement should apply in this situation. In *United States v. Palacios*, 604 Fed.Appx. 862 (10th Cir. 2015), police

raided a stash house and found large quantities of drugs and two guns. *Id.* at 683. The defendant in that case rented a room at that residence but was not present on the premises during the raid. *Id*. The defendant pleaded guilty to maintaining a drug-involved premises in exchange for dismissal of the remaining charges. *Id*. The defendant objected to the offense level calculation being based on the entirety of the drugs seized in the raid, and the firearm enhancement. *Id*., at p 683-4. The Tenth Circuit found that it was appropriate for the offense level to be calculated based on the entirety of the drugs found at the raid because not only did the defendant allow the use of the premises for the underlying controlled substance offense, but he participated by possessing a dangerous weapon and received money for the drugs. *Id*, at 685. The *Palacios* court noted,

> "The main problem for Mr. Palacios in his effort to limit his responsibility for the amount of drugs found in the raid …is the nature of the offense to which he pled guilty. His plea agreement sets forth the elements the United States was required to prove to convict him under 21 U.S.C. § 856: 'a. The defendant *used a place* … for the *purpose of manufacturing or distributing a controlled substanc*e; and b. The defendant knew that the place was used for such a purpose."
> *Id*.

The Court then went on to reference *United States v. Dickerson*, 195 F.3d 1183 (10th Cir. 1999) to support its logic. *Id*. In discussing a conviction under § 856(a), the Court explained:

> 'By its very nature, the offense of conviction involved the participation of other persons. More specifically, in order to violate [the statute], Dickerson had to provide the house or building and other parties had to use the house to engage in drug trafficking activity. For purposes of sentencing, then, Dickerson can be held accountable for any reasonably foreseeable activities engaged in by the parties using his house for drug trafficking activities.... See U.S.S.G. § 1B1.3(a)(1)(B) (in a case involving jointly undertaken criminal activity, relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity").
> *Id* at 686, citing *Dickerson*, at 1188–89 (emphasis added and citations omitted).

The Court went on to explain:

14

> "While Mr. Palacios claims he never admitted to being part of a jointly undertaken criminal activity and thus cannot be held responsible for the entire amount of drugs found during the raid, our decision in Dickerson makes clear that when one maintains a drug house, he becomes responsible for the reasonably foreseeable activities of those who use the house for the distribution of drugs."
> *Id*.

Here, Defendant Patel is making the same arguments made in *Palacios,* contending that because he never admitted to being part of any drug distribution conspiracy, he cannot be held responsible for the entirety of the narcotics seized during the raid. *Palacios* and *Dickerson* defeat that argument. The joint criminal activity was running the drug premises. Possession of narcotics by the employees and residents is foreseeable in this case when Patel admits he knew drug use at the hotel that he owned, managed, and lived, was rampant. To claim now, after swearing under oath in court, that Defendant Patel had no idea there were drugs in the drug premises because he did not actively use or sell them is ludicrous. It is akin to being shocked that there are peanuts in your peanut butter.

### III.     Objection to firearm enhancement

The same theory holds true for the two-point enhancement for a dangerous weapon being possessed. Pursuant to USSG §1B1.1, Application notes 1.(E), a dangerous weapon is defined as (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).   In this case, we have several firearms found in close proximity to narcotics: (1) one .38 special pistol found in a drawer with narcotics Jonathan Craft's room at the Best Choice Inn, (2) three pistols in Willie Horton's room where he kept narcotics, and (3) one pistol found in Larry Woolridge's room.   Additionally, there were four

bb-gun or airsoft pistols/rifle found in the hotel. One airsoft pistol was in A.L.'s room, another was photographed in another room, three were in and around the office space at the Best Choice Inn, and one airsoft pistol was found next to the computer. Testimony at trial from both the housekeepers and co-defendant Willie Horton would be that these three belonged to Kamal Bhula and were kept in the office for deterrence purposes.

Clearly all of these weapons were possessed in furtherance of maintaining the drug premises, or for distributing narcotics. While all defendants have been quick to point out that the airsoft weapons in the office were not real firearms, they resemble as such to someone who doesn't have an opportunity to examine them closely. Under the caselaw, even a hand in a pocket that gives the impression one is holding a gun can be properly deemed using a dangerous weapon. *United States v. Farrow,* 277 F.3d 1260, 1266 (10th Cir. 2002), citing *United States v. Pool,* 973 F.2d 1528, 1531, n. 1 (10th Cir. 1991) (even though defendant carried a toy gun, an object that appeared to be a dangerous weapon should be treated as a dangerous weapon.); accord *United States v. Taylor*, 960 F.2d 115, 116 (9th Cir. 1992) (appearance of a bulge under defendant's shirt that resembled a fun was a dangerous weapon). These weapons appear to be real guns and fit the definition of dangerous weapon.

Again, in the *Palacios* case, the defendant objects to the firearm enhancement because he did not admit possessing it in relation to the offense for which he pleaded guilty, and there is no evidence he possessed a firearm during his offense of conviction. *Palacios*, at 686. Although Palacios admitted to owning one of the guns found, he asserted it was not related to his offense of conviction because he was nowhere near the house at the time of the raid, and there was no evidence the gun was anywhere nearby on the day he accepted drug money at the house. *Id*.

The Palacios court referenced U.S.S.G. § 2D1.1 app n. 11(A), stating the "enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was

16

connected to the offense." Again quoting *Dickerson*, the *Palacios* court noted that, "[w]e have held that the government bears the initial burden of proving possession by a preponderance of the evidence, and proof of possession may be established by showing mere proximity to the offense." *Id*., at 687 (quoting *Dickerson* at 1188). The Court noted that the gun in *Palacios* was located near large amounts of drugs and was available for use by co-defendants planning to distribute drugs at the premises. *Id*. "While [the defendant] would like to ignore this fact, it is not improbable that the loaded gun was available to facilitate the intended drug sale that day." *Id*. "It is irrelevant that [the defendant] was not at the house when the gun was found in proximity to the drugs." *Id*, citing *Dickerson* at 1188-89. The enhancement was upheld.

   Here, Defendant Patel is making the same arguments as in *Palacios* and *Dickerson* regarding the guns in the Best Choice Inn. Although Defendant Patel has never admitted to owning any firearm found at the Best Choice Inn, it was foreseeable to Mr. Patel that in his drug-ridden motel where narcotics use was "rampant," that his employees to include Craft, and Horton would be carrying firearms to accompany their drug trafficking. These firearms were found in close proximity to the narcotics found in their room. Nor was it clearly improbable that the guns would have been used to facilitate the maintaining the drug-involved premises or other drug trafficking. This is all that is necessary to prove the firearm enhancement.

   Additionally, it was also foreseeable that in that environment in which Patel was running a predominantly cash business, that co-defendant Bhula would have some type of weapon, even if it was a BB gun or air-soft pistol. To argue he couldn't have known that his employees or other parties in the hotel would have firearms is really stretching the bounds of believability. The purpose of possessing these weapons was, in the least, to protect the drug-premises and the safety of those engaged in maintaining it, and for Craft and Horton to facilitate selling drugs. Therefore, the two-point enhancement for possession of a dangerous weapon should apply.

### IV. Objection to paragraphs 56-70

Defendant Patel objects to the paragraphs in the PSR that contain Offense Behavior not Part of Relevant Conduct because it is "very disputed." Doc. 610, p. 6. He is entitled to request the PSR state that he denies this conduct, but it should not be stricken from the PSR because these paragraphs are accurate recitations of the allegations in this case. In objecting to the factual provisions of a PSR, the defendant has an affirmative duty to make a showing that the information in the PSR is unreliable and articulate the reasons why the facts contained therein were untrue or inaccurate. *United States v. McDonald*, 43 F.4th 1090, 1096 (10th Cir. 2022) (quotations omitted). A mere objection to the reliability of the evidence in the PSR is insufficient to trigger a district court's fact-finding obligation. *Id.*; see also *United States v. Barnett*, 828 F.3d 1189, 1192 (10th Cir. 2016) (to state an "adequate objection," the "defendant must do more than simply state that he objects to the PSR's bottom line"); cf. *Leeper v. United States*, 1988 WL 142429, *2 (D. Kan. Dec. 23, 1988) (unpublished) (vague charges of factual error do not implicate the court's power to resolve factual disputes about the PSR). Even where the defendant does make objections, the court may properly adopt the PSR after considering those objections. See *United States v. Burkins*, 596 F. App'x 685, 691 (10th Cir. Dec. 23, 2014) (unpublished) (citing *United States v. Wilson*, 545 F. App'x 714, 716-17 (10th Cir. Sep. 19, 2013) (unpublished)).

Again, the PSR contains the correct allegations in this case. Defendant Patel takes issue with the section that covers Offense Behavior Not Part of Relevant Conduct. Every PSR has this section, and this Court is bound to consider all information relevant to sentencing. Offense Behavior Not Part of Relevant Conduct should always be considered, and it would be error to

ignore it. At an initial sentencing, Congress has provided generally that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Concepcion v. United States*, 142 S.Ct. 2389, 2400 (2022) (quoting 18 U.S.C. § 3661); see also *United States v. Frederick*, 897 F.2d 490, 492 (10th Cir. 1990) (under Section 3661, "the continued practice of considering all relevant evidence is presumptively correct").

Defendant Patel's denial of these crimes is perfectly acceptable to note in the PSR. He did not plead guilty to these charges. However, a grand jury found probable cause for them more than once. It is appropriate that they remain in the PSR, and Mr. Patel may request that his version be included as well.

## CONCLUSION

The United States hereby requests that the Court overrule Defendant Patel's objections for the reasons articulated above. He has presented no caselaw in support of his requests. The United States request for sentence will be forthcoming, and will be consistent with its agreement in the plea.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed 11/7/2023*
LETITIA CARROLL SIMMS
JACK E. BURKHEAD
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that on the 7th day of November 2023, I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel of record for defendant to be served by electronic means.

*Filed Electronically*
LETITIA CARROLL SIMMS
Assistant U.S. Attorney