IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CRIMINAL NO. 19-1631 DHU |
| ) | |
| ) | |
| **PRAGNESHKUMAR PATEL,** ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S
SENTENCING MEMORANDUM (DOC. 628)**

The United States hereby responds to Defendant Patel's *Sentencing Memorandum* (Doc. 628) filed January 11, 2024.

**I.     Procedural History**

On July 13, 2023, the Defendant pleaded guilty to Count 8 of the Second Superseding Indictment, which charged Maintaining a Drug-Involved Premises and Aiding and Abetting, in violation of 21 U.S.C. § 856(a) and 18 U.S.C. § 2. In his plea agreement, Defendant Patel provided a robust and detailed factual basis to support his guilty plea. It starts with him declaring under penalty of perjury that, between approximately September 2017 and March 2018, he managed and controlled the Best Choice Inn. Doc. 580, p 4. He admitted under oath that in March 2018, he leased the Best Choice Inn to co-Defendant Kamal Bhula, who took over the on-site management of the hotel until June 18, 2019. *Id*. Patel also swore under oath in his plea agreement that from September 2017 through June 18, 2019, he made a profit from renting the hotel to tenants who used controlled substances on the premises, and he made it available for the purpose of unlawfully using controlled substances. *Id*. Patel admitted under oath that in his capacity as an owner and manager, he knew the tenants he rented to and persons he employed were using controlled substances in the individual rooms of the hotel and on the overall

Case 1:19-cr-01631-DHU   Document 633   Filed 01/18/24   Page 2 of 11

premises. *Id*. Patel also swore that in his capacity as the owner and manager, he knew that "rampant drug use" was occurring at the Best Choice Inn by the tenants and employees. *Id*. Patel swore under oath in his plea agreement that he was confronted with physical evidence of "pervasive drug use" at the Best Choice Inn, and he personally observed such activity on the premises. *Id*. Patel admitted under oath that he knew that using controlled substances was one of the primary purposes of the Best Choice Inn, and that he nevertheless allowed it to continue. *Id*.

II. **Acceptance of the Plea Provides Certainty and Finality**

In consideration of acceptance of Defendants' global plea agreement, the United States asks this Court to consider the parties' interest in minimizing the uncertainties of trial by negotiating this settlement. "The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties." *Missouri v. Frye*, 132 U.S. 1399, 1407 (2012). Parties in a criminal case must assess the likely outcome of motions and trial practice. Defendants in particular must weigh their tolerance for the risk of losing a trial against the benefits of a negotiated settlement. Likewise, the United States must weigh the public and the victim's interest against the risks of proceeding to trial.

The United States carefully weighed the evidence in this case and evaluated the impact that further litigation would have on the victims. Despite the cooperation and strength of the victims in this case, providing testimony in a case could – and oftentimes does – lead to further trauma.

Furthermore, as is common in sex trafficking cases, the victims in this case were chosen because they are vulnerable. They lack housing stability, they battle addiction, and they have developed a mistrust of law enforcement due to their past experiences and criminal histories. These circumstances make them prime targets for exploitation, and any defense attorney will aim

2

to convince a jury that a person like this is "lacking credibility," as has been alleged throughout the duration of this case. The confluence of all of these factors make the courtroom a decidedly unpleasant place for sex-trafficking victims: they are victimized initially, then they are subjected to rigorous and often demeaning cross-examination. Some of these women have worked very hard on their rehabilitation since surviving these crimes. Being subject to cross examination can be devastating for someone trying to put back the pieces of their life. This plea spares them of that indignity.

In negotiating the defendants' global plea agreements, the United States carefully considered the benefit of obviating the need for these women's testimony against the nature of the offense and defendants' histories. Accordingly, the United States asks this Court to accept defendants' plea agreements.

### III.   The United States' Recommends a Low-End Guideline Sentence

United States Probation disclosed the pre-sentence report ("PSR") on October 4, 2023. Doc. 597.  The PSR correctly calculated the total offense level to be 35 and criminal history category of I, *id*. at ¶¶ 55, 73, which results in an advisory guideline range of 168 to 210 months, roughly 14 to 17.5 years.[1]  The United States agrees with the math, and has supported these calculations in its response the Defendant's previously filed objections. (See Docs. 610 and 619). Consistent with the plea agreement, and for the reasons set forth below, the United States recommends that this Court sentence the Defendant to the low end of that correctly-calculated range, 168 months.  Furthermore, the United States requests three years of supervised release and a $100 special penalty assessment.

---

[1] While there are defense objections to the guidelines pending, the Court has not ruled on any objections. Therefore, the United States is working off the current calculation in the PSR.

### IV. The § 3553 Factors

A. Nature and Circumstances of the Offense

As the Court is aware, 18 U.S.C. § 3553(a) instructs that sentencing courts shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. Those factors cut in favor of the sentenced recommended by the Government. Here, the Defendant maintained an entire hotel as a drug premises. Indeed, through the active compliance of the Defendant, the Best Choice Inn carved out a well-deserved reputation as a hotspot for rampant drug activity in Albuquerque: the Defendant knew it; the police knew it; the drug dealers knew it; and the drug users knew it. The drug infestation at the Best Choice Inn was not fleeting or temporary. To the contrary, this activity occurred for years in a neighborhood that was struggling with narcotics and poverty.

The Defendant not only failed to do anything about it, but he profited off the misery of others. As the Defendant has made crystal clear during the lengthy pre-trial litigation, the visitor fees were levied not just on the sex workers, but on any other visitor to rooms where drugs were used or sold. It follows that if a person visited a room for more than ten minutes and used or sold drugs, then the hotel (and by extension the Defendant) would receive an additional ten dollars. Thus, while the years rolled by and the Best Choice Inn slowly morphed into the go-to spot on East Central to sell and use drugs, the Defendant profited one ten-dollar bill at a time.

To be sure, rampant drug use was not the Defendant's only profit center. He got his cut from the high-volume commercial sex work that occurred on the premises as well. While the Defendant did not plea to the sex trafficking counts, the Court should still consider these facts as they are part of the case as a whole. In fact, the defendant agrees there may have been a conspiracy to run a brothel. (See transcript of June 28, 2021 James hearing, at 238).

The Best Choice Inn, as owned and managed by the Defendant, was a one-stop-shop for illegal activity. The Defendant profited immensely from this operation with callous indifference. In fact, he informed one employee that he did not care what people did in his hotel as long as he got his money. And, he did.

B. <u>History and Characteristics of the Defendant</u>

Describing this case as an "American tragedy," and painting himself as an otherwise hard-working businessman who "somehow" got "caught up" in the activities of East Central, the Defendant suggests that his activities were not only minimal, but also aberrant. Doc. 628 at 1-7. The facts, however, do not support that argument. During the pendency of this case, the Defendant owned and operated another hotel in Alabama where he conducted business in a similar fashion to the Best Choice Inn. During the investigation of this case, law enforcement discovered in the Defendant's phone SMS text messages between himself and the manager or employee of his hotel in Alabama, listed in his phone as "Alicia 3." On April 21, 2019 at 1:16:34pm, "Alicia 3" sent Patel a text message saying, "Mr.peter the pimp call he wants to get a room." The, the following exchange then occurred:

> <u>Patel</u>: "which one[?]"
> <u>Alicia 3</u>: "238."
> <u>Patel</u>: "what u think… we are slow ??"
> <u>Alicia 3</u>: "We slow we need the but at the same we dont need no problems… I know he was doing good"
> <u>Patel</u>: "Give him one more chance and charge him for a door damage ok… Rate will be 69.99 plus tax and 129.99 plus tax on weekends."
> <u>Alicia 3</u>: "K… how much for the door"
> <u>Patel</u>: "$200 for door."
> <u>Alicia 3</u>: "K"

Following that was some apparently unrelated discussion before the conversation regarding the "pimp" resumes:

> <u>Patel</u>: "Ok did called the pimp."

5

> Alicia 3: "He called here."
> Patel: "Ok give him a call tell him he can come and rent a room but he has to be quite ok."

The two then discuss the fact that the number Alicia 3 has for the pimp does not work anymore and she will have to wait for him to call back.

> Patel: "Please take customer phone number every time some one call you take there phone number right away for anything."

Shortly thereafter other unrelated conversation occurs. However, at 2:24:18pm discussion regarding the pimp one again resumes:

> Patel: "Let Barbara know about pimp and don't let anyone go she can go down to 49.99 plus tax ok."

The discussion then turns to some third party individuals, but resumes at 2:30:16pm:

> Alicia 3: "Maybe so they fight more than the pimp."
> Patel: "How many room he need."
> Alicia 3: "2"
> Patel: "Give him a 215 and 237 tell him to move tomorrow to 238."
> Alicia 3: "Ok."
> Patel: "Does he need two or more room."
> Alicia 3: "Just 2… For right now… A lady book the rooms in her name tasha 214 and 237 … he said ok … From now on he will just come to the office in Pay"
> Patel: "ok."

On April 28, 2019, Alicia 3 notifies Patel about a customer who wants a better price. The following text message exchange ensues at 12:42:00pm.:

> Alicia 3: "Okay 237 about to check out."
> Patel: "Keep that 80 for today tell him its to late to check out today."
> Alicia 3: "He said he's he need a better price by tomorrow because you have to treat your guests right he said he know he's doing illegal he respect your rules but he needs you to give him a better price if not he's going to check out in the morning."
> Patel: "Tell him for better price he need have at least two rent because of traffic go to his room I will give him 59.99 plus tax each room or he has to pay higher price for one room that's best I can do… Two room"
> Alicia 3: "Ok."
> Patel: "Let him know weekend price will be different"

On May 1, 2019 the following exchange ensued:

6

> Alicia 3: "Mr.peter im going to have to give refund back to 224 she scared to stay here."
> Patel: "No because there enough light and no need be scared we got camera… When did she rent a room"
> Alicia 3: "10:04"
> Patel: "So its's been 22 minutes tell no refund but u can move her to down stair room close to office."

There was then apparently some type of further confrontation between the scared customer and Alicia 3 at approximately 10:29pm:

> Alicia 3: "Did you hear her"
> Patel: "Who"
> Alicia 3: "The girl in here… She said its not been 30 minutes so she wants her money back."
> Patel: "Tell sorry no refund it's u have notified us not come and ask for money do not move her room to… Tell her sorry no refund … It's doesn't give a right to come and use that as excuse for refund nothing wrong with room place is secure we have camera everywhere and light is on there 24 hour some one office to."

On June 23, 2019, there is correspondence regarding drug activity at the hotel. The conversation begins approximately at 12:26pm when Alicia 3 writes, "Drugs deals and the police where here on the property before day this morning." Patel asks why the police were there, and Alicia says they were looking for someone. Patel states, "That's nothing to do with us police will go to any motel look for some one [sic] every day."

From these exchanges, the Court can be supremely confident that the crimes the Defendant committed in Albuquerque do not amount to an "American tragedy." Instead, profiting from crime is what the Defendant does. Whether it be in Albuquerque or Alabama, the Defendant is willing to allow illegal activity on his property so long profits can be had. The business plan was simple: the crime (and resulting profits) can continue so long as it does not attract attention from law enforcement or cost him money. And should the police end up at his hotel, his philosophy was that it did not concern him because "police will go to any motel look

for some one every day." That same philosophy ruled the day at the Best Choice Inn. His tenants could do whatever they wanted so long as he got his money.

In a strained attempt to add a gloss of normalcy to his activities, the Defendant draws a head-scratching comparison between what was occurring at the Best Choice Inn and the Las Vegas strip. While the United States will confess to a bit of confusion over this comparison, it appears that the Defendant is suggesting with a straight face that cosmic injustice has befallen him because, in his view, the Las Vegas strip is "rampant" with drug use and prostitution. But, the United States is unaware of the MGM Grand or Bellagio levying upcharges to visitors at their properties who the CEO knows are present to commit crimes. It stands to reason that those legitimate establishments forgo the $10 profit and instead call the police. In the end, the Defendant's comparison crumbles under the weight of facts: the Best Choice Inn existed to exploit a vulnerable clientele by illegally squeezing every last penny out of them.

C. Factors Detailed in 18 U.S.C. § 3553(a)(2)

In addition to considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court shall also consider:

> (2) the need for the sentence imposed –
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant, and'
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The low-end of the guidelines sentence in this matter would reflect the seriousness of the conduct and provide just punishment for the offense under the circumstances. The proposed sentence reflects the culpability of the Defendant while taking into account his lack of criminal history.

In most criminal schemes, the high-visibility perpetrators are often targeted the most: the

Willie Hortons, the Jonathan Crafts, and the Eddie Hills. They are the face of the crime, doing the dirty work for the organization. They have lived in the neighborhood, and they know the rules of the streets. Sometimes for them (but not in this case) committing crime is synonymous with survival. But to accomplish any real deterrence, it is important for law enforcement and the Courts to address those further up the chain—those who are truly profiting off such schemes. The one who profited most off the exploitation occurring at the Best Choice Inn was the Defendant. It was his business plan, and it was his bank account growing. In this case, the Defendant profited from every drug deal done at the Best Choice Inn. He was the boss, and his punishment should reflect his circumstances.

The harm caused by the Defendant's actions contributed greatly to the general struggles of this neighborhood. The Defendant suggests that the takedown of the Best Choice Inn has helped nothing in that part of town. To be sure, this prosecution did not solve drug addiction and poverty in Southeast Albuquerque. No single case can. But, that does not absolve the Defendant from his crimes. A low-end guideline sentence would send the message to those who remain that contributing to and profiting from societal misery have consequences.

D. Avoiding Unwarranted Sentence Disparity

While the concern over preventing unwarranted sentence disparities is well-founded, courts have repeatedly noted that mitigating this risk is only one factor that should be considered when imposing a sentence. *United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir. 2010). More specifically, disparate sentences are permitted "where the disparity is explicable by the facts on the record. *United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006). So long as the imposed sentence falls within the "range of possible" outcomes supported by the circumstances of the offense, the reviewing court must defer to the district court's judgement. *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007). A minor variance need be supported by less

justification than a major variance. *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Defendant requests a 100% variance from the guidelines. There are no mitigating circumstances in this matter that warrant that type of variance. There is nothing about this case that warrants such a sentence. The Defendant's actions were not caused by drug addiction or mental health struggles, but were performed for years with a clear head and motivated by nothing but greed. The lack of criminal history does not warrant such a variance, especially when the Defendant profited most from this endeavor and was involved for the longest period of time when compared to his co-defendants.

## CONCLUSION

The United States hereby requests that the Court accept the global plea agreement, adopt the findings in the PSR, and sentence the Defendant to the low end of the applicable guideline range.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed 1/18/2024*
LETITIA CARROLL SIMMS
JACK E. BURKHEAD
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that on the 18th day
of January 2024, I filed the foregoing
pleading electronically through the
CM/ECF system, which caused counsel
of record for defendant to be served
by electronic means.

***Filed Electronically***
LETITIA CARROLL SIMMS
Assistant U.S. Attorney